# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA
### FOURTH DIVISION

_____

Lieutenant Medaria Arradondo, Lieutenant
Donald Harris, Sergeant Charles Adams,
Sergeant Dennis Hamilton, and
Lieutenant Lee Edwards

      Plaintiffs,

        v.

City of Minneapolis, the Minneapolis
Police Department, and Timothy Dolan,
an, individual,

      Defendants.

_____

Case Type:  Employment
Court File No.:  07-CV-4736

**AMENDED COMPLAINT
AND DEMAND
FOR A JURY TRIAL**

Plaintiffs, Lieutenant Medaria Arradondo, Lieutenant Donald Harris, Sergeant Charles Adams, Sergeant Dennis Hamilton, and Lieutenant Lee Edwards, through their attorneys, **JOHN A. KLASSEN, P.A.**, 700 Lumber Exchange, 10 South Fifth Street, Minneapolis, Minnesota, 55402, and **MULLER & MULLER, P.L.L.C.**, 3109 West 50th Street, No. 362, Minneapolis, Minnesota 55410, state and allege for their Amended Complaint against the above-named Defendants as follows:

## NATURE OF CLAIM

1.     This is an action brought to secure relief for violations of rights guaranteed by the United States Constitution under 42 U.S.C. § 1983 ("Section 1983"), 42 U.S.C. § 1981 ("Section 1981"), the Minnesota Human Rights Act, Minn. Stat. § 363A.01 et seq. ("MHRA"), and the Minneapolis Civil Rights Ordinance §§ 139.40(b)(3) and (m) ("MCRO"). Additionally, Plaintiffs shall be filing charges of discrimination with the Equal Employment Opportunity

Commission under Title VII, 42 U.S.C. § 2000e et seq., and will amend this Amended Complaint in a timely manner to include those claims.

**JURISDICTION AND VENUE**

2.      Plaintiffs bring this action under and jurisdiction thereof is conferred on this Court by virtue of 28 U.S.C. § 1331, 42 U.S.C. § 1983 and 42 U.S.C. § 1981.

**PARTIES**

3.      Plaintiff Medaria Arradondo ("Plaintiff Arradondo"), is an adult African American male who now and at all times relevant was a resident of Hennepin County, State of Minnesota, and is a citizen of the United States. At all times material herein, Plaintiff Arradondo was an "employee" of the Minneapolis Police Department and the City of Minneapolis.  Plaintiff Arradondo has been employed as a sworn police officer in Minneapolis since 1989, and currently holds the rank of Lieutenant, and he is posted to the 4th Precinct Community Response team.

4.      Plaintiff Donald Harris ("Plaintiff Harris"), is an adult African American male who now and at all times relevant was a resident of Hennepin County, State of Minnesota, and is a citizen of the United States. At all times material herein, Plaintiff Harris was an "employee" of the Minneapolis Police Department and the City of Minneapolis.  Plaintiff Harris has been employed as a sworn police officer in Minneapolis since 1987, and currently holds the rank of Lieutenant, and he is posted to the 4th Precinct Investigations.

5.      Plaintiff Charles Adams ("Plaintiff Adams"), is an adult African American male who now and at all times relevant was a resident of Hennepin County, State of Minnesota, and is a citizen of the United States. At all times material herein, Plaintiff Adams was an "employee" of the Minneapolis Police Department and the City of Minneapolis.  Plaintiff Adams has been

employed as a sworn police officer in Minneapolis since 1986, and currently holds the rank of Sergeant, and was until November 30, 2007 posted to the Homicide Unit.

6.      Plaintiff Dennis Hamilton ("Plaintiff Hamilton"), is an adult African American male who now and at all times relevant was a resident of Hennepin County, State of Minnesota, and is a citizen of the United States. At all times material herein, Plaintiff Hamilton was an "employee" of the Minneapolis Police Department and the City of Minneapolis.  Plaintiff Hamilton has been employed as a sworn police officer in Minneapolis since 1989, and currently holds the rank of Sergeant, and is posted to the 5th Precinct Investigations.

7.      Plaintiff Lee Edwards ("Plaintiff Edwards"), is an adult African American male who now and at all times relevant was a resident of Dakota County, State of Minnesota, and is a citizen of the United States. At all times material herein, Plaintiff Edwards was an "employee" of the Minneapolis Police Department and the City of Minneapolis.  Plaintiff Edwards has been employed as a sworn police officer in Minneapolis since 1989, and currently holds the rank of Lieutenant, and is posted to the 1st Precinct Property Crimes.

8.      Defendant City of Minneapolis ("Defendant Minneapolis"), is a Minnesota political subdivision. At all times material herein, Defendant Minneapolis was each Plaintiff's "employer."  The Minneapolis Police Department is a department of such Defendant.

9.      Defendant Timothy Dolan ("Defendant Dolan"), is an adult Caucasian male who now and at all times relevant was a resident of the state of Minnesota, and at all times material to this lawsuit was an employee of Defendant Minneapolis, including the position as each Plaintiff's superior in his capacity as Interim Minneapolis Police Chief and Minneapolis Police Chief.

## FACTS

10.     This is an action to redress race and color discrimination in employment by the Minneapolis Police Department ("Defendant Minneapolis").

11.     Defendant Minneapolis, through its police department, has systematically and continuously discriminated in favor of white persons and against persons of color, including African American police officers.

12.     Defendant Minneapolis has a history of tolerating racist and discriminatory remarks by its white police officers and engaged in discriminatory conduct against its African American police officers.

13.     Over the last approximately twenty years, African American officers employed by Defendant Minneapolis have been subjected to a hostile work environment and have been subjected to disparate treatment and disparate impact on the bases of their race and color.  They have also been subjected to retaliation for opposing and reporting such conduct.

14.     On or about January 1992, every African American officer at Defendant Minneapolis received a hate letter signed "KKK" through the interoffice police departmental mail.  This letter threatened each African American officer's life.

15.     A recent example of the tolerance Defendants have for racially discriminatory conduct by white officers includes, without limitation, comments by Lieutenant Robert Kroll in 2007 that United States Congressman Keith Ellison, who is a Muslim and black, is a terrorist. Kroll also made discriminatory comments against a homosexual aide to Minneapolis Mayor R.T. Rybak, Stephen Bosacker. An Inspector, a Deputy Chief of Professional Standards, and a Commander of Training were present when Kroll made these racist statements, none of whom objected or took any corrective action in response to Kroll's discriminatory statements. Upon

information and belief, Kroll, a crony of Defendant Dolan's, wears a motorcycle jacket with a "White Power" badge sewn onto it.

16.     Allegations arose in 2006-07, during Defendant Dolan's confirmation process as Police Chief, that he and other white friends had, while they were teenagers, targeted African American families for vandalism. Defendant Dolan is also alleged to have placed racist hate literature in the school lockers of African American students at Henry and North High Schools in Minneapolis while a teenager. Shockingly, and troubling, Defendant Minneapolis did not find this information to be an obstacle in its appointment of a Police Chief who would be providing a substantial portion of his department's services to communities of color.

17.     Defendant Minneapolis has discriminated in favor of white persons and against African Americans in its hiring practices, its promotional practices, its training and educational practices, its assignment practices, its disciplinary practices, its overtime compensation practices and in its treatment of African American officers in other rights, privileges and conditions of employment.

18.     Although Defendant Minneapolis has a long history of discriminatory conduct against African American officers, these actions have become more severe, pervasive, systemic and institutionalized since the appointment of Defendant Timothy Dolan as Interim Police Chief on or about March 2006, and since his subsequent confirmation as Police Chief in January 2007.

19.     Since Defendant Dolan's tenure began, every one of his decisions to demote officers has involved African Americans on the police department, with the exception of the demotion of Lucy Gerold, a white female.

20.     As of September 12, 2007, only one African American officer in the Minneapolis Police Department remains as a sworn officer in an appointed or detailed position (typically,

appointed and detailed positions are the highest ranking and highest paid positions), Deputy Chief Valerie Wurster, who is planning on retiring within several months from this date.  There are approximately 19 white persons in such positions.

21.     As of November 1, 2007, there is only one African American in the Minneapolis Police Department holding a rank above Lieutenant, i.e. Wurster, and upon information and belief she is planning to retire within several months.  After that date, Defendant Dolan will have an all white police command in Defendant Minneapolis.

22.     Wurster was appointed under the tenure of former Police Chief William McManus, not Defendant Dolan.

23.     As of May 2007, approximately 18% of Defendant Minneapolis's sworn police officers were persons of color.

24.     Defendant Dolan has fired, demoted or transferred every African American male officer who held the position of Captain, Inspector, or higher rank.  The only African American of rank position that he hasn't fired, Wurster, is known to be retiring shortly so he does not have to fire her.

25.     In 2007, Defendant Dolan, in response to a suggestion by another officer that Plaintiff Arradondo be considered for an enhanced career opportunity, stated, "Well, you know he has filed a [civil rights] charge against us…so its no," clearly implying that this protected conduct would cost Plaintiff Arradondo a chance at a job.  This racially discriminatory and retaliatory work environment permeates Defendant Minneapolis from the position of Police Chief on down through the ranks.

26.     As of early 2008, there will be no sworn officers of color above the rank of Lieutenant.

**Disparate Treatment in the Hiring of Sworn Officers by Minneapolis Police Department**

27.     During the period of Plaintiffs' employments, Defendant Minneapolis has continually failed to follow through on its promises to diversify its police department ranks by hiring more African American sworn officers.

28.     The reasons for this failure to hire African Americans include, without limitation, subjecting African American candidates to higher scrutiny during the backgrounds unit process, which results in washing out a higher percentage of African American potential candidates than white candidates.

29.     Another reason Defendant Minneapolis has failed to hire African Americans is the discriminatory bias of its former screening psychologist, Dr. Gary Fischler, who conducted biased psychological testing of officer candidates which resulted in a higher percentage of African American candidates being screened out than white candidates.  Fischler served as Defendant Minneapolis's screening psychologist for approximately 20 years, until 2005.  His replacement, Dr. Campion, was later removed because of his affiliation with outspoken anti-GLBT groups.  Again, Defendant Dolan continues to associate himself with persons known to have openly discriminatory attitudes.

30.     Plaintiffs have each witnessed or been subjected to these unlawful actions by Defendants and reasonably believed them to be discriminatory and constituting a hostile work environment based on race and color.

**Disparate Treatment of African American Officers in Training and Educational Opportunities**

31.     African American officers, including Plaintiffs, are treated less favorably than white officers in regard to opportunities for training and education, including notice of such opportunities.

32.     Examples include, without limitation, attending management schools, FBI National Academy, Southern Police Institute, and Northwest Command School. While all officers receive notice of these opportunities, white officers are regularly given greater notice of these career enhancement opportunities by Defendant Minneapolis and its employees, including through recommendations and encouragement.

33.     Similarly, white officers are given the opportunity to attend these command schools and career-enhancing events at a greater rate than are African American officers. This leads to less opportunity for African American officers to advance in the department.

34.     A recent example of the disparate opportunities afforded African American officers in training experiences in comparison to white officers occurred in summer 2007, when African American officer Charles Adams (not Plaintiff Adams) put in a request to be accepted to the Field Training Officer School (FTO). Sergeant John Billington, who is white, was in charge of the school at this time. Billington did not permit Adams to participate, stating it was because of Adams' past performance as a rookie, and then changing the reason, stating that it was because Adams was too new on the force. Adams was denied this training opportunity. It was later learned by Plaintiffs that white officers had attended this FTO School had less time on the force than Adams.

35.     Plaintiffs have each witnessed or been subjected to these unlawful actions by Defendants and reasonably believed them to be discriminatory and constituting a hostile work environment based on race and color.

**Disparate Treatment of African American Officers in Detailed Assignments**

36.     Detailed positions have the benefit of increased rank, pay and experience. Detailed assignments place an officer into the rank of Sergeant or higher, despite not holding that civil service rank. To be detailed to such a position is beneficial to an officer and is considered a career enhancement opportunity.

37.     To date, under Defendant Dolan's tenure, there have been no African American officers detailed to positions with the rank of Captain or higher.

38.     Defendant Dolan has regularly detailed white officers to such rank positions, even though they have not even taken the civil service examination for the position.  Defendant Dolan has detailed white officers to such positions when they are equally or lesser qualified than African American potential candidates. This has resulted in an almost exclusively white command structure.

39.     During the last several years, Defendants have repeatedly detailed white officers over African American officers who were ahead of the white officers or even first on the promotions list, often later promoting the white officer.  This, too, has led to an almost exclusively white command structure.

40.     Other examples, without limitation, of Defendants' discriminatory conduct in handing out detailed assignments are the recent failures to detail African Americans Lieutenant Eddie Frizell and Sergeant Art Knight.  In both those instances, white officers who either scored lower on the civil service exam or who were not on the promotions list were given the detailed positions.  Once again, this has contributed to an almost exclusively white command structure.

41.     Plaintiffs have each witnessed or been subjected to these unlawful actions by Defendants and reasonably believed them to be discriminatory and constituting a hostile work environment based on race and color.

**Disparate Treatment of African American Officers in Appointed Positions**

42.     Appointed positions also have the benefit of increased rank, pay and experience. Appointed positions place an officer into command positions, despite not holding that civil service rank. To be appointed to such a position is beneficial to an officer and is considered a career enhancement opportunity.

43.     To date, under Defendant Dolan's tenure, there have been no African American officers appointed to positions of Captain or higher rank, with the exception of Plaintiff Edwards.   Instead, Defendant Dolan has repeatedly removed African American officers, including Plaintiff Harris (who served as Deputy Chief) and Plaintiff Edwards (who served as Inspector of 4th Precinct), and replaced them with white officers of lesser experience and qualifications.  This practice has resulted in an almost exclusively white command structure.

44.     Defendants' discriminatory conduct in these appointments is illustrated by the following:  when Defendant Dolan demoted Plaintiff Edwards from his appointed position as Inspector of 4th Precinct, he named Lieutenant Mike Sauro as Acting Inspector.  Sauro is white and has numerous civil rights complaints against him, including being the subject of one of the largest police brutality settlements in Minneapolis history. Yet, Defendants' choice for Acting Inspector in a precinct that primarily serves minority communities is this white officer with a lengthy history of civil rights complaints.

45.     Another white officer, Captain Mike Martin, was eventually named Inspector of 4th Precinct.  Neither Plaintiff Arradondo nor Plaintiff Harris were considered or chosen, despite

their previous experiences as Acting Inspector (Arradondo), and Inspector and Deputy Chief (Harris).  Both Plaintiff Arradondo and Plaintiff Harris were superior in qualifications and experience than either Sauro or Martin for these positions.

46.     Once again, this has contributed to an almost exclusively white command structure.

47.     Plaintiffs have each witnessed or been subjected to these unlawful actions by Defendants and reasonably believed them to be discriminatory and constituting a hostile work environment based on race and color.

**Disparate Treatment of African American Officers in Strategic Command Positions**

48.     During Plaintiffs' employments at Defendant Minneapolis, African Americans have been grossly underrepresented in the strategic command positions within the Minneapolis Police Department.  These key positions include, without limitation:  Homicide, Internal Affairs, Narcotics, SWAT/ERU, VOTF, Licensing, and Recruitment/Training.

49.     Limiting the number of African American officers in these positions limits the number of African American officers advancing into the upper ranks of the department, as well as limits their access to overtime.

50.     The disproportionate number of white officers in the internal affairs unit increases the feelings of bias against African American officers who are the subject of investigations.

51.     A disproportionate number of white officers serve on SWAT/ERU and SWAT/ERU delivers the majority of its services to communities of color in Minneapolis.

52.     Even though Narcotics, Gang and Homicide units deliver the majority of their services to minority communities, these units are each overrepresented by white officers.

53.     The lack of diversity in the command staff positions, and the disproportionate number of white officers in those positions, leads to a lack of diversity on discipline panels, which are formed from command staff.  This in turn leads to bias in the discipline of officers, with African American officers being treated disparately.

54.     Without limitation, a recent example of the bias of Defendants toward white officers in command assignments occurred when distinguished African American officer Tony Adams submitted his name to be appointed the next Minneapolis Police Department Cadre Officer.  Defendants instead selected a white officer, Lora Hanks, who has lesser seniority and qualifications than Tony Adams.

55.     Plaintiffs have each witnessed or been subjected to these unlawful actions by Defendants and reasonably believed them to be discriminatory and constituting a hostile work environment based on race and color.

**Disparate Treatment of African American Officers in Demotions**

56.     Under Defendant Dolan's tenure, including the other examples set forth in this Complaint, Defendants have demoted African American officers in a discriminatory manner.

57.     Defendant Dolan's choices for demotions have been based on race and color.

58.     Since Defendant Dolan's tenure as Police Chief began in January 2007, all of his demotions have been of African American officers with the exception of Lucy Gerold, a white female.

59.     Even in the case of Gerold's demotion, she, as a white officer, has been given preferential treatment.  For example, African American officers when demoted by Defendants have returned to their last held civil service rank of Lieutenant.  Gerold, who last held the civil service rank of "officer" prior to being appointed Deputy Chief, was only demoted down to the

rank of Inspector, which is still an appointed rank and several pay scales above both the Lieutenant and officer positions. This does not happen when African American officers are demoted. Exceptions are clearly made for white officers and are not made for African American officers.

60.     Plaintiffs have each witnessed or been subjected to these unlawful actions by Defendants and reasonably believed them to be discriminatory and constituting a hostile work environment based on race and color.

### Disparate Treatment of African American Officers in Discipline

61.     Defendant Minneapolis has repeatedly and discriminatorily disciplined its African American officers more harshly and frequently than its white officers for comparable or more serious misconduct.

62.     One example of this discriminatory conduct is the use of so-called "last chance agreements" when officers allegedly commit misconduct. This arrangement results in the termination of an officer and then reinstating the officer with a restrictive and punitive agreement that mandates the officer will be terminated with no opportunity to question the termination if the restricted officer engages in any misconduct for the next 5 years, or similar time period.  This effectively places the officer under the complete mercy of Defendant Minneapolis and takes away the officer's  rights as a member of the union.

63.     Since 1999, numerous white officers have engaged in serious misconduct ranging from supplying narcotics and alcohol to minor-age strippers, to sustained complaints by the Civilian Review Authority, to sustained civil rights complaints by citizens, to DUIs, to making discriminatory comments about citizens of color, and other misconduct meriting internal affairs investigations. None of these white officers received "last chance agreements" for such

misconduct; while African American officers who have better records or who have committed far less serious offenses are forced to enter into them.

64.     Defendant Minneapolis has also demoted or meted out undesirable reassignments as discipline to African American officers for alleged misconduct at a greater rate than for white officers.  African American officers have been regularly disciplined and lost command positions and other assignments for alcohol offenses.  In contrast, and by example, a white Sergeant with two alcohol offenses on his record was recently detailed by Defendant Dolan to the rank of Lieutenant.

65.     Another example of Defendants' preferential treatment given to white officers occurred when a white officer, William Woodis, was alleged to have kicked out an African American citizen's teeth. Although Assistant Chief Lubinski recommended termination of Woodis, Defendant Dolan refused to terminate him, and then, to make matters worse, Dolan allegedly lied to Minneapolis City Council Member Ralph Remington about this decision.

66.     Another example of the discriminatory manner in which Defendants discipline African American officers in comparison to white officers occurred in the tragic case of *Mum v. City of Minneapolis*. Six officers were involved, five white and one African American.  The only officer punished was the African American, who was the most peripherally involved in the incident out of the six officers.

67.     The recent meritless, undesirable and punitive transfer of Plaintiff Adams for alleged insubordination is another example of the discriminatory application of demotions and discipline upon African American officers by Defendants.

68.     Plaintiffs have each witnessed or been subjected to these unlawful actions by Defendants and reasonably believed them to be discriminatory and constituting a hostile work environment based on race and color.

**Disparate Treatment of African American Officers in Overtime Opportunities**

69.     Certain positions at Defendant Minneapolis create more overtime compensation opportunities than other positions.

70.     White officers have been the decision makers for the vast majority of overtime assignments.

71.     African American officers are not considered to coordinate the very lucrative overtime positions.  White officers are chosen to coordinate big events which present overtime opportunities. This results in white officers getting the vast majority of the extra pay.

72.     An example, without limitation, of this discriminatory allocation of such extra pay opportunities occurs with, for example, the Holidazzle Parades, Gay Pride Parade, Twin Cities Marathon, and Hennepin Avenue Block Party.

73.     White officers also control the intake of part-time private jobs that come in to the department, which results in nearly all of this work going to other white officers.

74.     A recent example of the discriminatory assignment of overtime opportunities came in the wake of the I-35W bridge collapse. Three white officers were in charge of bridge collapse response overtime assignments, including Lieutenant Robert Kroll, who has a history of discriminatory attitudes and conduct.  The result was that overtime pay was abundant for white officers, and such opportunities were lacking for African American officers, including Plaintiffs with the exclusion of Plaintiff Harris.

75.     Certain special assignments at Defendant Minneapolis such as ERU, Canine, and Honor Guard have greater access to overtime details than others.  The vast majority of officers who get these assignments are white.  The assignment process is largely controlled by white officers. This too results in a disproportionate amount of overtime compensation going to white officers.

76.     Plaintiffs have each witnessed or been subjected to these unlawful actions by Defendants and reasonably believed them to be discriminatory and constituting a hostile work environment based on race and color.

**Breaches of the Federal Mediation Agreement in Regard to Diversity**

77.     On or about December 2003, Defendant Minneapolis entered into a federally governed Memorandum of Agreement with the Unity Community Mediation Team.  This agreement came about as a result of the United States Justice Department's involvement in concerns by Minneapolis's minority communities that the Minneapolis Police Department was permeated by a culture of racism.

78.     As part of the Memorandum of Agreement, Defendant Minneapolis agreed to develop and maintain a recruitment strategy for the purpose of improving the diversity of the employees in all ranks, the pool of candidates for all ranks, and the employees in those job titles intended to be in a career path leading to a sworn position, whether classified or appointed, within the police department.  To date, three years later, there is no Recruitment Strategy on file and there is no Career Path Report on file.  Defendants have failed to fulfill this obligation to the Plaintiffs and others.

79.     Similarly, as part of the Memorandum of Agreement, Defendant Minneapolis agreed to develop and implement a formal succession plan for supervisory positions and ranks,

and to monitor the participation of minority groups and females.  To date, three years later, there is no Succession Plan on file and there is no monitoring system in place.  Defendants have failed to fulfill this obligation to the Plaintiffs and others.

80.   Again, as part of the Memorandum of Agreement, Defendant Minneapolis agreed to develop a system and to track the participation of employees in training and career achievements by race and protected class.  To date, three years later, there is no tracking mechanism in place.  Defendants have failed to fulfill this obligation to the Plaintiffs and others.

81.   Further, as part of the Memorandum of Agreement, Defendant Minneapolis agreed to develop and implement a formal mentorship program for all ranks and to monitor the participation of female and other protected class officers (including African Americans) in the program.  To date, three years later, there is no mentoring program on file and, thus, no monitoring.  Defendants have failed to fulfill this obligation to the Plaintiffs and others.

82.   Plaintiffs have each witnessed or been subjected to these unlawful actions by Defendants and reasonably believed them to be discriminatory and constituting a hostile work environment based on race and color.

**Individual Plaintiffs:**

83.   Each Plaintiff has witnessed or been subjected to the aforementioned unlawful conduct during his employment at Defendant Minneapolis.

84.   Plaintiffs are all African American police officers who have served on the Minneapolis Police Department for at least 18 years.

85.   All five Plaintiffs are veteran officers, holding the rank of Sergeant or Lieutenant.

86.   Each is a decorated officer, with commendations by the police department and/or the communities they serve.

87.     During their employments by Defendant Minneapolis, Plaintiffs have been subjected to repeated discriminatory conduct because of their race and color, and they have also been forced to witness and observe the unlawful and discriminatory treatment of other African American persons by Defendants.

88.     Defendants unlawful conduct has had a disparate impact on Plaintiffs on the basis of race and color, has resulted in the disparate treatment of Plaintiffs on the basis of race and color, and has resulted in the creation of a hostile work environment for Plaintiffs based upon race and color.

**Plaintiff Arradondo:**

89.     Plaintiff Arradondo first became employed by Defendant Minneapolis as a sworn police officer in 1989.  At all times relevant, his job performance has been satisfactory.

90.     Plaintiff Arradondo has witnessed and observed himself and other African American officers being subjected to discriminatory conduct by Defendants on the basis of race and color.

91.     During his employment by Defendant Minneapolis, Plaintiff Arradondo has been repeatedly passed over in promotions, appointments, and in detailed assignments. These include being repeatedly passed over in favor of white officers for appointed positions such as Inspector and Deputy Chief, or detailed positions such as Captain.

92.     The current detailed Captains are all white and have never served as Acting Inspector, which Plaintiff Arradondo has, and they were selected over him.  The current detailed Captains have equal or lesser qualifications than Plaintiff Arradondo.  Yet they were selected for these positions over him.

93.     A current white Inspector never served as an acting Inspector nor attended the FBI Academy, both of which Plaintiff Arradondo has accomplished, yet she was appointed to an Inspector position over him. Plaintiff Arradondo's qualifications are superior to this white Inspector's.

94.     After Plaintiff Arradondo served as an Acting Inspector under former police chief William McManus, and had served as the commander of the Strategic Tactical Operations Unit under McManus, Defendant Dolan reassigned and demoted him upon being named interim police chief in 2006.  Defendant Dolan gave Plaintiff Arradondo the title of Executive Officer. Despite the newly created title, Defendants never provided Plaintiff Arradondo an office from which to work or even a job description.  After 8 months in this job, Plaintiff Arradondo was demoted to the Community Response Team at the rank of Lieutenant, where he remains today. This event coincided with Defendant Dolan being confirmed as Police Chief.

95.     Plaintiff Arradondo has been denied overtime compensation opportunities which have been given to white officers.

96.     Plaintiff Arradondo has been denied opportunities for part-time jobs which have been given to white officers.

97.     Plaintiff Arradondo was denied overtime pay by Defendants for work he performed on behalf of Defendant Minneapolis during the period 2004-2007, as the Critical Incident Notification Person for the Minneapolis Police Department.  Defendant Dolan's response to Plaintiff Arradondo's request for overtime pay was, "I am not interested in paying Rondo."  White officers are treated more favorably in their requests for overtime pay.

98.     As a result of this discriminatory refusal to pay Plaintiff Arradondo overtime pay, he filed a civil rights charge against Defendants alleging discrimination based on race and color.

99.     In retaliation for Plaintiff Arradondo's civil rights charge, Defendant Dolan, in Summer 2007, in response to a suggestion by another officer that Plaintiff Arradondo be considered for an enhanced career opportunity, stated, "Well, you know he has filed a [civil rights] charge against us…so its no," clearly implying he intended to retaliate against Plaintiff Arradondo.

100.    On several occasions, Plaintiff Arradondo has communicated his concerns about the discriminatory environment at Defendant Minneapolis and his concerns about Defendant Dolan's involvement in said discrimination to Defendant Minneapolis.

101.    Prior to Defendant Dolan's confirmation as police chief, Plaintiff Arradondo informed City Council of the discriminatory environment in the department and that Defendant Dolan would not be a positive change for race relations if appointed as Police Chief.

102.    Plaintiff Arradondo has spoken at length to Council Members (at the time) Paul Zerby and Natalie Johnson Lee regarding race and color discrimination at Defendant Minneapolis.

103.    Plaintiff Arradondo has spoken with Ron Edwards and Clyde Bellecourt in their capacity as Co-Chairs of the Police Community Relations Council ("PCRC") regarding discrimination at Defendant Minneapolis.  These issues were then raised at official PCRC meetings, attended by Defendant Minneapolis, and were brought before the Public Safety Regulatory Services Committee, also attended by Defendant Minneapolis.

104.    On or about September 11, 2007, Plaintiff Arradondo and other African American officers met with Michael Jordan, director of the Minneapolis Department of Civil Rights, and communicated their concerns, including those set forth in this Complaint.  Jordan was dismissive

of these concerns, never followed up on the report, and later publicly dismissed the officers' allegations as those of "disgruntled cops near the end of their careers."

105.    Plaintiff Arradondo reasonably believed Defendants' unlawful conduct to be discriminatory and constituting a hostile work environment based on race and color.

**Plaintiff Harris:**

106.    Plaintiff Harris first became employed by Defendant Minneapolis as a sworn police officer in 1987.  At all times relevant, his job performance has been satisfactory.

107.    Plaintiff Harris has witnessed and observed himself and other African American officers being subjected to discriminatory conduct by Defendants on the basis of race and color, particularly in regard to how the systems and processes in place at Defendant Minneapolis result in a disparate impact and disparate treatment of African American officers.

108.    During his employment by Defendant Minneapolis, Plaintiff Harris has been passed over in promotions, appointments, and in detailed assignments. These include being passed over by Defendant Dolan in favor of white officers for appointed positions such as Inspector, Acting Inspector and/or detailed positions such as Captain.

109.    As set forth above, when Defendant Dolan demoted Plaintiff Edwards from Inspector of 4th Precinct, he appointed Lieutenant Mike Sauro, who is white with a lengthy history of civil rights violations.

110.    The current detailed Captains are all white and have never served as Inspector or Deputy Chief. Plaintiff Harris has served in both positions, yet the white officers were selected over him.

111.    A current white Inspector never served as an Inspector nor Deputy Chief, both of which Plaintiff Harris has, yet she was appointed to an Inspector position over him.

112.    Plaintiff Harris served as Deputy Chief under former police chief William McManus.   Once Defendant Dolan became police chief, he reassigned and demoted Plaintiff Harris to the position of at the rank of Lieutenant, in 4th Precinct Investigations, a far less desirable position in which he remains today.

113.    Plaintiff Harris has observed the systems and processes in place at Defendant Minneapolis result in greater overtime opportunities being made available to white officers.

114.    Plaintiff Harris has observed the systems and processes in place at Defendant Minneapolis result in greater part-time job opportunities being made available to white officers.

115.    On or about September 11, 2007, Plaintiff Harris and other African American officers met with Michael Jordan, director of the Minneapolis Department of Civil Rights, and communicated their concerns, including those set forth in this Complaint.  Jordan was dismissive of these concerns, never followed up on the report, and later publicly dismissed the officers' allegations as those of "disgruntled cops near the end of their careers."

116.    Plaintiff Harris reasonably believed Defendants' unlawful conduct to be discriminatory and constituting a hostile work environment based on race and color.

**Plaintiff Adams:**

117.    Plaintiff Adams first became employed by Defendant Minneapolis as a sworn police officer in 1986.  At all times relevant, his job performance has been satisfactory.

118.    Plaintiff Adams serves as the president of the department's Black Police Officers Association.   He has been outspoken on issues of race and color discrimination in the department.

119.    Plaintiff Adams has witnessed and observed himself and other African American officers being subjected to discriminatory conduct by Defendants on the basis of race and color.

120.    During his employment by Defendant Minneapolis, Plaintiff Adams has been repeatedly passed over in promotions and in detailed assignments. These include being repeatedly passed over in favor of white officers for detailing to special assignments.

121.    Former Police Chief McManus recommended Plaintiff Adams for the position of temporary Commander of the Homicide Unit after the then-Commander was out pending an investigation.

122.    Defendant Dolan advised against appointing Plaintiff Adams to this position.

123.    Plaintiff Adams has been denied overtime compensation opportunities which have been given to white officers.   For example, after the I-35W bridge collapse, several white Homicide Investigators received nearly 150 hours of overtime from the body recovery detail. The white officers in charge of coordinating the overtime never informed Plaintiff Adams of these opportunities until the last days of the detail, and as a result, he received only 4 hours of overtime compensation exclusive of mandatory overtime.

124.    Plaintiff Adams has been denied opportunities for part-time jobs which have been given to white officers.

125.    Plaintiff Adams has been subjected to disparate discipline than white officers. For example, on or about November 28, 2007, Plaintiff Adams was, despite being recognized as one of the best Homicide detectives in the department, demoted in a very public and humiliating fashion from Homicide by being transferred to a less prominent investigation position for alleged insubordination.   The allegation of insubordination is meritless, and white officers have been treated less harshly for similar or more severe alleged misconduct. Adams' partner, who is white, engaged in the same or similar conduct as Adams and suffered no adverse consequences. The conduct of Adams caused no negative consequences upon his job performance in solving

murders. Such a demotion/transfer has rarely if ever previously occurred. Defendant Dolan and Homicide Lieutenant Amelia Huffman, both white, participated in this decision based upon Huffman's recommendation and then proceeded to publicize the manner in a way that is not done with respect to adverse personnel decisions about white officers.

126.     Another example of disparate discipline suffered by Plaintiff Adams occurred in February 2007, when Defendant Dolan falsely accused him of providing private details of a rape case to a community activist, Ron Edwards.  Defendant Dolan then instructed Plaintiff Adams that in the future, he could not give public information to citizens.  This was one of Plaintiff Adams' job duties, and white officers were not given the same restrictions.  By contrast and by way of example, Lieutenant Amelia Huffman, who is white, recently disclosed non-public, wholly uncorroborated information, denigrating a murder victim and causing harm to his family, without any reprimand or discipline.

127.     Plaintiff Adams' brother and son both serve as sworn officers of Defendant Minneapolis.  Both have been denied jobs and training and education in retaliation for Plaintiff Adams' leadership of the Minneapolis Black Police Officers Association.  White officers of equal or lesser qualifications are given beneficial treatment in these rights, conditions and privileges of the job.

128.     Over the past ten years, Plaintiff Adams has been outspoken on issues of discrimination at Defendant Minneapolis. As a result, he was passed over for promotion to sergeant for approximately five years, until 2000.  By way of contrast and example, a lesser qualified white officer was promoted ahead of Plaintiff Adams.

129.     Since Defendant Dolan's tenure began, Plaintiff Adams has witnessed that there is little if any minority recruitment by Defendant Minneapolis, and a near complete lack of

educational opportunities for African American officers, while white officers are aggressively recruited and those already on the force are provided greater educational opportunities.

130.    On or about September 11, 2007, Plaintiff Adams and other African American officers met with Michael Jordan, director of the Minneapolis Department of Civil Rights, and communicated their concerns, including those set forth in this Complaint.  Jordan was dismissive of these concerns, never followed up on the report, and later publicly dismissed the officers' allegations as those of "disgruntled cops near the end of their careers."

131.    Plaintiff Adams reasonably believed Defendants' unlawful conduct to be discriminatory and constituting a hostile work environment based on race and color.

**Plaintiff Hamilton:**

132.    Plaintiff Hamilton first became employed by Defendant Minneapolis as a sworn police officer in 1989.  At all times relevant, his job performance has been satisfactory.  His nearly twenty year record on the department is exemplary with the exception of a single off-duty incident involving alcohol in May 2007, in regard to which he has complied with all required treatment and discipline.

133.    Plaintiff Hamilton has witnessed and observed himself and other African American officers being subjected to discriminatory conduct by Defendants on the basis of race and color.

134.    During his employment by Defendant Minneapolis, Plaintiff Hamilton has been repeatedly passed over in promotions and in detailed assignments. These include being repeatedly passed over in favor of white officers for detailing to special assignments and positions of higher rank.

135.    During past administrations, Plaintiff Hamilton observed that there have been fewer opportunities for African American officers, including himself, than for white officers to be detailed to a rank/position that is higher than the officer's civil service rank.  To be given such a detailed position is a career enhancing opportunity to gain experience and knowledge of the position, and this gives the officer an extraordinary advantage over other officers not given that opportunity.

136.    However, during Defendant Dolan's tenure as police chief, since January 2007, no African American officers have been given these opportunities for detailed positions. White officers of equal or lesser qualifications have been given such opportunities.  Nor have African American officers been given the opportunity for appointed positions.

137.    Other examples of race and color based obstacles that Defendants have created for Plaintiff Hamilton and the other Plaintiffs is in regard to the use of assessments as a means of determining promotions or rankings during promotion testing.  The past system for assessments was based on a written pass – fail test and an oral board made up of local community and police professionals. Candidates' job performance and work history were important considerations. The new process, under Dolan's administration especially, is a pass – fail written test and an assessment by outsiders. This new system omits any recognition of a candidate's past performance or current job performance.  This is critical because it has permitted white officers with numerous behavioral and performance issues to be promoted and placed into leadership positions.

138.    The new promotion system using assessments also favors officers who have experience with assessments through networking and assessor experience, which again is heavily weighted to white officers.  One certain way to gain such experience is to become an assessor,

which is done by getting onto training unit lists of potential assessors and then being selected. White officers, again, receive greater notice and access to these lists and thus have a higher rate of being selected as assessors, giving them advantages in later promotions.

139.    Plaintiff Hamilton signed up to be an assessor in 1998 and over the next several years was not selected.   He later learned that several white Sergeants from that same list had been selected as assessors more than once during the period he had been waiting to be selected. Finally, in 2003, he was given a chance to be an assessor, by fellow Plaintiff, Lieutenant Lee Edwards.   This long delay in a career enhancing opportunity has hindered Plaintiff Hamilton's chances to compete for a promotion to Lieutenant, and white officers have not faced these same obstacles in promotion.

140.    Plaintiff Hamilton has also been denied overtime opportunities which have been given to white officers.   For example, after the I-35W bridge collapse, white officers received nearly all of the overtime hours.   White officers were in charge of coordinating the overtime.

141.    Plaintiff Hamilton has been denied opportunities for part-time jobs which have been given to white officers.

142.    Plaintiff Hamilton has been subjected to disparate discipline than white officers. For over 17 years, he served Defendant Minneapolis without any complaints, disciplinary actions or any allegations against him for violation of departmental policies. On or about May 17, 2007, he abused alcohol and was involved in a domestic assault incident with his spouse.   He was properly charged with 5th degree domestic assault.   He sought the proper treatment for alcohol abuse and adhered to all legal requirements regarding this incident. However, he was then terminated by Defendant Dolan on or about November 19, 2007, and given a last chance agreement to return to work.   This last chance agreement makes him eligible to be terminated

without recourse if any other alleged violation occurs over the next five years.  It is a very onerous and severe restriction under which to be employed. In Plaintiff Hamilton's experience as an Internal Affairs Investigator, and member of the Minneapolis Police Department, there have never been examples of white officers terminated for a first offense of 5th degree domestic assault, or similar misconduct, especially if alcohol was involved.  White officers, who do not have Plaintiff Hamilton's exemplary record, have engaged in far more serious misconduct without this severe discipline being imposed.

143.    Over the past eighteen years, Plaintiff Hamilton, like Adams, has been outspoken on issues of discrimination at Defendant Minneapolis. As a result, he too has been passed over for promotions.  White officers with equal or lesser qualifications have been promoted ahead of Plaintiff Hamilton.

144.    Since Defendant Dolan's tenure began, Plaintiff Hamilton has witnessed that there is little if any minority recruitment by Defendant Minneapolis, and a near complete lack of educational opportunities for African American officers, while white officers are aggressively recruited and those already on the force are provided greater educational opportunities.

145.    On or about September 11, 2007, Plaintiff Hamilton and other African American officers met with Michael Jordan, director of the Minneapolis Department of Civil Rights, and communicated their concerns, including those set forth in this Complaint.  Jordan was dismissive of these concerns, never followed up on the report, and later publicly dismissed the officers' allegations as those of "disgruntled cops near the end of their careers."

146.    Plaintiff Hamilton reasonably believed Defendants' unlawful conduct to be discriminatory and constituting a hostile work environment based on race and color.

**Plaintiff Edwards:**

147.    Plaintiff Edwards first became employed by Defendant Minneapolis as a sworn police officer in 1989.  At all times relevant, his job performance has been satisfactory.

148.    Plaintiff Edwards has witnessed and observed himself and other African American officers being subjected to discriminatory conduct by Defendants on the basis of race and color.

149.    During his employment by Defendant Minneapolis, Plaintiff Edwards has been passed over in promotions, appointments, and in detailed assignments. These include being passed over by Defendant Minneapolis in favor of white officers for appointed positions such as Inspector, Acting Inspector and/or detailed positions such as Captain.

150.    In August 2007, Defendant Dolan demoted Plaintiff Edwards from Inspector of 4th Precinct.  The basis for this demotion was alleged violations of the department code of conduct.  Defendants falsely alleged Plaintiff Edwards drove a department vehicle while intoxicated and made offensive comments to subordinates. After demoting Plaintiff Edwards, Defendants appointed Lieutenant Mike Sauro, who is white with a lengthy history of civil rights violation, to be Acting Inspector of the 4th Precinct.

151.    This discipline of Plaintiff Edwards was unmerited, and it was harsher than that provided to white officers in similar circumstances.   Plaintiff Edwards was eventually replaced as Inspector by Captain Mike Martin, a white officer with less experience and qualifications.

152.    Plaintiff Edwards is now demoted to the rank of lieutenant, working in 1st Precinct Property Crimes, a far less desirable and lesser paid position.

153.    Plaintiff Edwards has been denied overtime opportunities which have been given to white officers.

154.    Plaintiff Edwards has been denied opportunities for part-time jobs which have been given to white officers.

155.    On or about Fall 2007, Plaintiff Edwards met with Michael Jordan, director of the Minneapolis Department of Civil Rights, and investigator Ron Brandon, at the Monte Carlo Restaurant in Minneapolis, and communicated his concerns about discrimination at Defendant Minneapolis, including those set forth in this Complaint.  Jordan was dismissive of Plaintiff Edwards' concerns, never followed up on the report, and later publicly dismissed the allegations as those of "disgruntled cops near the end of their careers."

156.    Plaintiff Edwards reasonably believed Defendants' unlawful conduct to be discriminatory and constituting a hostile work environment based on race and color.

157.    Plaintiffs have lost the opportunity for advancement, promotion, increased pay, increased retirement and pension contributions, and other rights, privileges and benefits of employment as a result of Defendants' unlawful conduct.

158.    Defendant Dolan has aided and abetted in the creation and maintenance of this hostile work environment during his tenure as acting police chief and police chief.

159.    Defendant Dolan, despite his participation in the unlawful conduct to which Plaintiffs have been subjected, continues to work at Defendant Minneapolis without adequate supervision. Defendant Dolan has not been disciplined for his actions, nor has any remedial or corrective action ever been taken by Defendant Minneapolis, despite Plaintiffs' reports and complaints.

160.    Defendant Minneapolis is vicariously liable and liable under the theory of respondeat superior for the unlawful conduct perpetrated against Plaintiffs because of the participation of its management and officials in the unlawful conduct, as well as the condoning

of these actions by Defendant Minneapolis's management and officials. Defendant Minneapolis did not take prompt or effective remedial action to stop the unlawful conduct. Defendant Minneapolis's managers' and officials' adverse actions against Plaintiffs were within the scope of their employment.

161.    As a direct and proximate result of Defendants' unlawful actions, Plaintiffs have lost salary, benefits, and suffered garden variety embarrassment, humiliation, emotional pain and anguish, and loss of enjoyment of life.  Defendants engaged in this conduct against Plaintiffs with malice or reckless indifference to their rights.

## COUNT ONE
## DEPRIVATION OF CIVIL RIGHTS UNDER COLOR OF LAW, 42 U.S.C. § 1983

162.    Plaintiffs reallege the foregoing paragraphs as though fully set forth herein.

163.    Defendants are persons under 42 U.S.C. § 1983.

164.    Defendant Minneapolis is a political subdivision of the State of Minnesota. Defendant Dolan, acting as an agent of Defendant Minneapolis, acted under color of state law when he engaged in unlawful conduct against Plaintiffs.  Defendant Dolan's actions constitute government action.  Defendant Dolan acted in both his official and individual capacities in violating Plaintiffs' rights.

**Violation of Plaintiffs' Rights to Equal Protection under the Fourteenth Amendment**

165.    Defendant Minneapolis is a public employer and receives monetary funding from public sources.

166.    Plaintiffs are employees of Defendant Minneapolis's police department and, therefore, enjoy rights, privileges and conditions of employment which include being free of harassment, discrimination and retaliation based upon their race and color.

167.    Defendants subjected Plaintiffs to harassment, discrimination and retaliation based upon their race and color.

168.    Defendants had no legitimate or rational bases for subjecting Plaintiffs to harassment, discrimination or retaliation based upon their race and color.

169.    The purpose and effect of the unlawful policies and practices of Defendants was to deprive Plaintiffs, under color of state law, statute, regulation, custom and usage, the rights, privileges, and immunities secured by the Fourteenth Amendment to the Constitution of the United States providing for Equal Protection for all citizens and all other persons within the jurisdiction of the United States.

170.    As a result of the unconstitutional actions of Defendants, Plaintiffs have been harmed and have lost salary and benefits, have been denied employment opportunities and advancement, and have suffered and will continue to suffer garden variety emotional pain and anguish, and compensatory damages in an amount in excess of $75,000.

**COUNT TWO**
**RACE AND COLOR DISCRIMINATION – 42 U.S.C. § 1981**

171.    Plaintiffs reallege the foregoing paragraphs as though fully set forth herein.

**Disparate Treatment Discrimination, Harassment and Retaliation**

172.    Defendants treatment of Plaintiffs during their employments constitutes disparate treatment, harassment, and retaliation.  Defendants denied Plaintiffs opportunities based upon their race and color. This denied Plaintiffs the opportunities for advancement and promotion in employment, and other rights, privileges and conditions of employment.

173.    Plaintiffs made timely reports to Defendant Minneapolis of these unlawful actions.

174.    These actions subjected Plaintiffs to discrimination, harassment and retaliation because of their race and color, within the meaning of 42 U.S.C. § 1981, and Defendants' actions, therefore, constitute unfair employment practices against Plaintiffs, for which Defendants are liable.

175.    As a result of these intentional acts of discrimination, Plaintiffs have been harmed and has lost salary and benefits, has been denied employment opportunities and advancement, and have suffered and will continue to suffer garden variety emotional pain and anguish, and compensatory damages in an amount in excess of $75,000.

**COUNT THREE**
**RACE AND COLOR DISCRIMINATION – MINNESOTA HUMAN RIGHTS ACT**

176.    Plaintiffs reallege the foregoing paragraphs as though fully set forth herein.

**Disparate Treatment, Disparate Impact Discrimination, Harassment and Retaliation**

177.    Defendant Minneapolis' treatment of Plaintiffs during their employments constitutes disparate treatment, disparate impact, harassment, and retaliation.  Defendant Minneapolis denied Plaintiffs opportunities based upon their race and color. This denied Plaintiffs the opportunity for advancement and promotion in employment, and other rights, privileges and conditions of employment.

178.    Plaintiffs made timely reports to Defendant Minneapolis of these unlawful actions.

179.    These actions subjected Plaintiffs to discrimination, harassment and retaliation because of their race and color within the meaning of Minn. Stat. § 363A.01 et seq., and Defendant Minneapolis' actions, therefore, constitute unfair employment practices against Plaintiffs, for which Defendant Minneapolis is liable.

180.    As a result of these acts of discrimination, Plaintiffs have been harmed and have lost salary and benefits, have been denied employment opportunities and advancement, and have suffered and will continue to suffer garden variety emotional pain and anguish, and compensatory damages in an amount in excess of $75,000.

**COUNT FOUR**
**AIDING AND ABETTING RACE AND COLOR DISCRIMINATION**
**MINNESOTA HUMAN RIGHTS ACT**

181.    Defendant Dolan is a person within the meaning of Minn. Stat. § 363A.03, subd. 30.

182.    Defendant Dolan intentionally aided and abetted Defendant Minneapolis in engaging in illegal discrimination in violation of Minn. Stat. § 363A.14.

183.    As a result of these acts of discrimination, Plaintiffs have been harmed and have lost salary and benefits, have been denied employment opportunities and advancement, and have suffered and will continue to suffer garden variety emotional pain and anguish, and compensatory damages in an amount in excess of $75,000.

**COUNT FIVE**
**RACE AND COLOR DISCRIMINATION**
**MINNEAPOLIS CIVIL RIGHTS ORDINANCE**
**MCRO § 139.40(b)(3)**

184.    Plaintiff realleges the foregoing paragraphs as though fully set forth herein.

**Disparate Treatment and Disparate Impact Discrimination, Harassment and Retaliation**

185.    Defendant Minneapolis' treatment of Plaintiffs during their employments constitutes disparate treatment, disparate impact, harassment, and retaliation.   Defendant Minneapolis denied Plaintiffs opportunities based upon their race and color. This denied Plaintiffs the opportunity for advancement and promotion in employment, and other rights, conditions and privileges of employment.

186.     Plaintiff made timely reports to Defendant Minneapolis of these unlawful actions.

187.     These actions subjected Plaintiffs to discrimination, harassment, and retaliation because of race and color within the meaning of MCRO § 139.40(b)(3), and Defendant Minneapolis' actions, therefore, constitute unfair employment practices against Plaintiffs, for which Defendant Minneapolis is liable.

188.     As a result of these acts of discrimination, Plaintiffs have been harmed and have lost salary and benefits, have been denied employment opportunities and advancement, and have suffered and will continue to suffer garden variety emotional pain and anguish, and compensatory damages in an amount in excess of $75,000.

## COUNT SIX
## AIDING AND ABETTING RACE AND COLOR DISCRIMINATION
## MINNEAPOLIS CIVIL RIGHTS ORDINANCE
## MCRO § 139.40(m)

189.     Plaintiff realleges the foregoing paragraphs as though fully set forth herein.

190.     Defendant Dolan intentionally aided and abetted Defendant Minneapolis in engaging in illegal discrimination in violation of MCRO § 139.40(m).

191.     As a result of these acts of discrimination, Plaintiffs have been harmed and have lost salary and benefits, have been denied employment opportunities and advancement, and have suffered and will continue to suffer garden variety emotional pain and anguish, and compensatory damages in an amount in excess of $75,000.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs respectfully pray:

A.     That the practices of Defendants complained of herein be adjudged, decreed and declared to be violative of the rights secured to the Plaintiffs by the Constitution of the United States, 42 U.S.C. § 1983, 42 U.S.C. § 1981, Minnesota Statute § 363A.01 et seq., and MCRO § 139.40 et seq.

B.     That a permanent mandatory injunction be issued requiring that Defendants adopt practices in conformity with the requirements of the Constitution of the United States, 42 U.S.C. § 1983, 42 U.S.C. § 1981, Minnesota Statute § 363A.01 et seq., and MCRO § 139.40 et seq.

C.     That a permanent prohibitory injunction be issued prohibiting Defendants from engaging in the practices complained of herein.

D.     That Plaintiffs be awarded compensatory damages in an amount to be established at trial.

E.     For an entry of an Order enjoining Defendants and their officers, agents and employees from subjecting Plaintiffs to differential treatment and from any retaliation against Plaintiffs for prior actions, or for bringing this action.

F.     That the Court retain jurisdiction until such time as the Court is satisfied that the Defendants have remedied the practices complained of herein and are determined to be in full compliance with the law.

G.     That the Court order Defendants to pay counsel for the Plaintiffs their reasonable attorneys' fees and the costs and expenses of this action.

H.     That Plaintiffs be awarded such other and further legal and equitable relief as may be found appropriate, just and/or equitable, including punitive damages.

**JURY DEMAND**

Plaintiffs hereby demand a trial by jury of all issues triable of right by a jury.

**JOHN A. KLASSEN, PA**

Date: December 10, 2007

/s/ John A. Klassen
  John A. Klassen, (No. 24434X)
700 Lumber Exchange Building
10 South Fifth Street
Minneapolis, MN. 55402
612-204-4533

**MULLER & MULLER, PLLC**

/s/ Andrew P. Muller
Andrew P. Muller (No. 32467X)
3109 West 50th Street, No. 362
Minneapolis, MN. 55410-2102
(612) 604-5341

**ATTORNEYS FOR PLAINTIFFS**